JAMES GRIFFIN, SHERIFF, &c., AND EX-OFF. ADMINISTRATOR OF RUFUS SEWALL, DEC'D, APPELLANT, vs. THOMAS ORMAN, SURVIVING PARTNER OF ORMAN & YOUNG, APPELLEES.

1. As a *general rule*, wherever exceptions will lie to the Master's report, it must be regularly confirmed before any order can be made upon it.

2. A decree directing a reference to a Master, for the purpose of ascertaining *any material fact* in the case, is not a *final* decree.

3. To give the Court of Appeals of the Territory of Florida jurisdiction of an appeal from a decree of the Superior Court, it was necessary there should be a *final* decree in the cause; appeals did not lie in that Court from interlocutory decrees or orders.

4. This Court will not be bound by the decision of the Court of Appeals of the Territory in a case where it appears said Court had no jurisdiction.

5. When there has been no *final* decree in a cause, excepting the one appealed from, this Court may, on appeal, examine the whole case, so far as it has been acted upon by the Circuit Court, and all prior or interlocutory orders or decrees any way connected with the merits of the final decree are open for consideration, notwithstanding such order or decree may be one of a Court of Appeal affirming a similar order or decree of an inferior Court.

6. If a dormant partner shares in the profits of a business, he is liable at law for all contracts, within the legitimate sphere of that business, by and with the firm.

7. A suit and judgment recovered against two of a firm is not a judgment against a third member not named in the pleadings.

8. Creditors cannot get relief in a Court of Equity until they have judgment at law and return of *nulla bona*, or what is equivalent thereto, on the *fi. fa.*

9. Creditors of a partnership have no lien upon the goods sold after a *delivery* thereof; and on suits by them they execute their judgment against the effects of the partnership and any other effects of the individual members parties to said suit—until then they cannot prevent the partners from *bona fide* selling and transferring the same even to one another.

10. The equitable doctrine of subrogation or substitution to the place of the creditor without any agreement, is applicable in cases where the person advancing money to pay the debt of a third party stands in the situation of a SURETY, or is compelled to pay it to protect his own rights.

11. As a general principle, each partner of a firm has a specific *lien* on the partnership stock, not only for the amount of his share, but for monies advanced by him beyond that amount for the use of the co-partnership, and that this lien extends to property purchased with the partnership funds as well as that standing in the partnership name; but where they *bona fide* sell and transfer the property to one of the firm, with *intention* that the effects assigned and sold are to be appropriated to the *private use* of the purchasing partner, then this lien is lost and the property ceases to be partnership property.

12. After a defendant has answered a bill in Chancery and submitted himself to the jurisdiction of the Court without objection, it is too late to insist the complainant has a perfect remedy at law, unless the Court of Chancery is wholly incompetent to grant the relief sought by the bill.

13. A Court of Equity will entertain a bill of *quia timet* in a proper case filed for the purpose of enforcing a specific performance and preventing a possible future injury, thereby quieting men's minds and estates, &c.

14. Equity may decree the performance of a general *covenant of indemnity*, though it sounds only in damages.

15. Chancery may order an instrument to be delivered up to be cancelled when it is void from matter appearing from proof taken in the cause, and will cancel agreements founded in fraud, imposition and misrepresentation.

This case was decided at Tallahassee.

FORWARD, J., read the following statement of the case, prepared by him:

The following is a brief statement of this case, as appears by the record:

On the 25th day of March, A. D. 1826, a partnership was formed between Thomas Orman, Andrew Young and Rufus Sewall, under the style of Orman & Young, *Sewall being a dormant partner;* said partnership was to continue for two years from the 7th March, 1826.

The partnership articles, being in writing, read as follows, viz:

" This agreement, made this twenty-fifth day of March, one thousand eight hundred and twenty-six, by and between

Thomas Orman and Andrew Young on the one part, and Rufus Sewall on the other part, witnesseth—

"That the said Thomas Orman and Andrew Young agree to transact and carry on business in the mercantile line at St. Andrew's Bay and Chipola, in Washington and Jackson counties, in the territory of Florida, for the term of two years, commencing on the seventh day of March, instant, and continuing to the seventh day of March, one thousand eight hundred and twenty-eight, the expense of conducting the business to be charged to expense account, and to comprehend all that is actually expended in transacting said business, together with the amount of said Orman & Young's board, the other expenses of said Orman & Young to be charged to their individual accounts; the said parties—that is to say, the said Sewall, Orman & Young—are not, in any instance, to take from the concern any money or moneys, or property of any kind, for individual purposes, except for necessary expenses, and are not to enter into any speculation on account of the concern, of any name or nature, out of the course of business, without the consent of all the parties, and are to make no use of the name of the firm or concern to promote their individual purposes. The said Sewall, on his part, agrees to aid in purchasing or to purchase, accept or to have accepted, by Moses Sewall, any time previous to the first day of October, one thousand eight hundred and twenty-six, a sum not to exceed one thousand dollars, and after the first day of October aforesaid, all sums that may be deemed necessary for conducting the business, either by purchasing or accepting: providing always the said Sewall becomes responsible, in his individual capacity, in an amount not exceeding four thousand dollars at any one time, and the said Sewall will at all times be acceptor or responsible for the said concern, during the term of the two years aforesaid, for all or any sums, as before stated, providing the concern in no instance have right or power to subject him, the

Griffin vs. Orman.—Statement of Case.

said Sewall, to become responsible for any sums exceeding four thousand dollars at any one time, and in no instance will the said Sewall be responsible, at any one time, for said concern for any sums exceeding the amount aforesaid; all transactions made by said Sewall for the concern to be free from all charges of commissions and all others, except such as the said Sewall has actually to pay, the concern, in all instances, to pay the actual expenses attending the business. At the expiration of the aforementioned two years, or as soon thereafter as the said Orman & Young can bring the business to a close, or to such a state as to determine the actual amount of net profits arising on all the business transacted within the aforesaid two years, to be divided in proportions of one-third each, one-third of the whole amount of net profits arising in the business to be paid over to the said Sewall, by the said Orman & Young, on or before the 1st day of March, one thousand eight hundred and twenty-nine, with interest, at six per cent. per annum, from and after the time of ascertaining and collecting the amount of net profits; but if the said Orman & Young do not pay over to the said Sewall such amount of net profits as may be ascertained and collected, on or before the first day of March, one thousand eight hundred and twenty-nine, then the said Orman & Young shall pay interest on the same to said Sewall, at two per cent. per month, until the same be paid. In case the said Sewall has, in any instance, to advance money or moneys for the said concern, he, the said Sewall, shall make no charge for such advances, but shall receive from the said concern, as full compensation for all such sums advanced, two per cent. per month until all such sums are refunded, unless a special agreement to the contrary be made.

"At the termination of the co-partnership—say, on the 7th day of March, one thousand eight hundred and twenty-eight —if any loss or losses has been sustained by the said concern,

the parties to the agreement are to suffer in equal proportions of one-third each—to say, the said Sewall one-third, said Orman one-third, and said Young one-third. All the profits belonging to said concern, at the expiration of the aforementioned two years, to be valued by the said parties, and sold or bought by them as they may agree.

"The said Orman & Young are to settle and close the business transacted within the aforementioned two years, without any charge, except what may be actually necessary for closing and settling the same. All the business transacted within the aforementioned two years, in which Thomas Orman, Andrew Young and Rufus Sewall are concerned, shall be done under the name, style and firm of Orman & Young.      (Signed,)          RUFUS SEWALL,
                                   THOMAS ORMAN,
                                   ANDREW YOUNG,
"Test: DANIEL McKENZIE."

Under these articles the said firm carried on business during said term. The business was conducted at St. Andrews' Bay and Chipola, in Florida, by said Orman and Young in person, and under the name and style of Orman & Young, the said Sewall residing in Alabama; that at the expiration of the co-partnership the said Orman & Young, who are in possession of all the books, accounts, goods, &c., as well as in possession of full knowledge of the business of said firm, make out severally a statement or estimate of the business of the firm for said Sewall, with a view, as is alleged by Sewall but denied by Orman & Young, to a final settlement between them.

The following is the estimate of Mr. Orman, viz:

| Amount of notes, | - | - | $28,400 |
| Ac't, | - | - | 16,600 |
| | | | $45,000 |

Griffin vs. Orman.—Statement of Case.

| | | | |
|---|---|---|---|
| Amount brought forward, | - | | $45,000 |
| Goods on hand, | - | - | 7,000 |
| Cotton    "    - | - | - | 4,000 |
| Gin house and lot, | - | - | |
| Horses and mules, | - | - | 1,000 |
| Corn, pork, &c., | - | - | 1,000 |
| 1 negro man, | - | - | 300 |
| 1    "    woman and child, | | - | 600 |
| 2    "    boys, | - | - | 900 |

| | |
|---|---|
| | $59,800 |
| Houses and lot at the Bay and this place, | |
| at least,    -    -    - | 200 |

| | |
|---|---|
| | $60,000 |

| | |
|---|---|
| Debts due from the concern, - | 24,000 |
| R. Sewall's am't previous to 7th March, | |
| 1828, his share of profits, - | 6,000 |
| Am'ts owing here and am'ts settled and | |
| bad debts,    -    -    - | 5,000 |

| | |
|---|---|
| | $35,000 |

The estimate made by Mr. Young and furnished said Sewall, as is alleged with a view to said settlement but denied, shows that on the 1st November, 1829, there was due the said Sewall on account current with said firm the sum of $7,036 88. Whether Mr. Orman included this in the " debts due from the concern" does not appear.

With these statements as a basis, a final settlement took place between the partners on the 14th January, A. D. 1829. At this settlement Orman & Young sold out their entire interest to Sewall for the sum of $17,500, to be paid them in assets of the firm. It is admitted that Orman & Young received from Sewall the said sum of $17,500 out of the said assets, and that *they executed to Sewall a conveyance of all*

*their interest in the assets of the concern.*—(See conveyance below.) At this settlement Sewall gave his *bond* to Orman & Young, with one E. J. Bower as surety, in which said Sewall *assumes the payment* of all the debts due by the firm previous to 14th January, 1829, and *binds* himself and surety in the penal sum of $20,000 to pay the debts as aforesaid. That the bond may appear, it is given at full length:

"Know all men by these presents, that we, Rufus Sewall and Ebenezer J. Bower, are held and firmly bound unto Orman & Young in the penal sum of twenty thousand dollars, for the payment whereof, well and truly to be made, we bind ourselves and heirs and assigns, jointly and severally, firmly by these presents, signed with our hands and sealed with our seals, this the fourteenth day of January in the year eighteen hundred and twenty-nine.

"The condition of the above bond is such, that whereas the above bound Rufus Sewall has purchased from Thomas Orman and Andrew Young, without claim, drawback or recourse upon them, the said Orman and Young in every way whatever; and the said Sewall has assumed the payment of all the debts of every description now due, or that hereafter become due from said firm for any and all transactions for account of said firm previous to the above date, and to recognize all agreements with the citizens of Jackson and Washington counties, Florida, whether oral or written, in purchase of cotton or other property, where they become liable to pay certain sums of money. Now, if the said Sewall shall well and truly perform his obligation, by paying the debts as aforesaid, and shall perform all the contracts and incur all the liabilities of the said firm, then this obligation to be void, else to remain in full force and virtue.

"Signed,    RUFUS SEWALL, [L. s.]
       E. J. BOWER,  [L. s.]"

At the same time Orman & Young executed this convey-

ance and transfer or assignment to said Rufus Sewall, viz: " *Territory of Florida, Jackson county:*

"This indenture, made this fourteenth day of January, in the year of our Lord one thousand eight hundred and twenty-nine, between Thomas Orman and Andrew Young, merchants, trading under the firm and style of Orman & Young, of the Territory and county aforesaid, of the one part, and Rufus Sewall, of the State of Alabama, of the other part, witnesseth: that for and in consideration of the sum of seventeen thousand five hundred dollars, paid by the said Sewall to the said Orman & Young, the receipt whereof is hereby acknowledged, the said Orman & Young have bargained, *sold and conveyed, relinquished and assigned over* to Rufus Sewall, his heirs and assigns, all the land, negroes, houses, store, goods and merchandize, horses, mules, gin, cotton, corn, pork, notes, accounts and all claims and demands whatever, of any description, in any way belonging to or acquired by the said firm of Orman & Young, with the exception of the notes, accounts and other property contained and specified in the annexed schedule, amounting to seventeen thousand five hundred dollars and seventy-three cents; and the said Orman & Young, for themselves, their heirs and assigns, do covenant and agree to and with the said Sewall, his heirs and assigns, the interests, rights and property, *delivered* as aforesaid AGAINST THE CLAIM OF THEM, the said Orman & Young, their heirs and assigns, will by these presents forever *warrant* and *defend.* In testimony whereof, the said Thomas Orman and Andrew Young have hereunto set their hands and affixed their seals, the day and year above written.

 "Signed,  THOMAS ORMAN, [L. S.]

     ANDREW YOUNG, [L. S.]"

On the 2nd of January, A. D. 1829, the said Orman & Young filed their bill of complaint, called by them a bill of *quia timet*, in the Superior Court of the county of Jackson,

before the Judge of the Western District of Florida, sitting in equity, setting forth in substance the anterior existence of said partnership as expressed in the articles of co-partnership, the final settlement of the affairs of said co-partnership between all the parties thereto, the sale of their interest to said Sewall in said concern, charging that said sale was made by them to said Sewall upon the terms that the said Sewall should well and truly pay all the debts of said firm, and should perform all the contracts and incur all the liabilities of the same; that he assumed the payment of all the debts, of every description, that were then due or to become due from said firm, &c.; "that the debts due and to become due, *including the amount due said Sewall*, as also the liabilities of said firm of a pecuniary character, did not amount to more than the sum of twenty-six thousand and fifty-four dollars and sixty-three cents, and, at the time of the contract and sale aforesaid, were estimated by said Sewall (the said Sewall having at all times access to the books of the firm) at the sum of $28,700, *in which the sum due said Sewall was included;*" that at the time of the sale they received from said Sewall the bond, with Bower as his security, above set forth; that in taking said bond they relied exclusively upon the pecuniary responsibility of Sewell alone, &c.; that said Bower was only accepted as security from the reliance which the said Orman & Young placed in his virtue and integrity, &c.

The bill further states, that said Sewall, in addition to his obligation contained in said bond, afterwards wrote to Messrs. A. Whiting & Co., J. L. Florence and W. A. Gasquet, who were creditors of the said firm of Orman & Young, and *assumed to pay them.*

The bill further charges, that at the time of the filing thereof, "*neither of these claims have yet been paid.*" "On one of these your orators have been sued, and are in daily expectation of being sued upon the others."

The bill further charges, that up to that time the said Sewall had only paid, of the debts due and owing by said firm, the sum of $872, and that they, the said Orman & Young, *had paid* to Kipman & Hyer, of Pensacola, $27.15, and that all of the above debts had been then due a year and more.

The bill sets forth and describes certain real estate that the said Sewall, under the contract and sale aforesaid, received from the firm of Orman & Young, *purchased with funds of said firm;* that he received under said contract a negro woman and boy, now at T. M. Bush's, in Washington county, and that he has in possession a negro man named Billy *not received from said firm.*

The bill further states, that said Sewall had placed in the hands of attornies, for collection, the debts which were due and owing said firm, and which had been assigned to said Sewall under said contract.

The bill further charges, that the said Rufus was then proceeding with all possible dispatch to close his business in this Territory; that he is offering his lands for sale, and these complainants have reason to fear, and do apprehend, not only inconvenience, trouble and vexation in and about the payment and liabilities of said firm of Orman & Young, but that unless they have speedy relief from this honorable Court, the said Rufus, in order to avoid the payment of said debts and in compliance with his obligation as aforesaid, will transfer, dispose of or so secrete his means that there will not be found property to reimburse the said Orman & Young, were they to rely upon the remedy at law upon said bond.

The bill further alleges, that the said Orman & Young believe that a proceeding at law would be inadequate and incomplete, by reason of the peculiar situation of said debts and their own situation, and they verily believe that before a proceeding of this kind could be brought to a final and successful judgment, the said Sewall will have left this Ter-

ritory and have transferred and otherwise disposed of the means whereby the same might be satisfied.

The bill further sets forth, that all of said creditors are exceedingly pressing, impatient for the payment of their demands; that, relying upon the obligation of said Sewall, they had made no arrangements to pay the same, nor will it be in their power so to do, without extraordinary trouble and *great loss to themselves*, &c.

The prayer of the bill was, that the Court would grant them the *writ of quia timet*, directed to the Marshal to take into his possession all the property of the said Sewall, and the same to keep until said Sewall shall enter into bond, with sufficient security, to deliver the same whenever it shall be required by the order or decree of the Court; or that he may take such part charged in this bill as having been received from or purchased with the funds or means derived from the firm of Orman & Young as aforesaid; also a writ of injunction, restraining the attornies of Sewall from paying over moneys in their hands, and *asking that the same* may be applied to the payment of the debts of said Orman & Young *assumed* as aforesaid by said Sewall; also, that the Court *decree the property received by Sewall from the co-partnership of Orman & Young under said purchase, and also the property purchased with the funds of said firm* A SPECIFIC FUND, out of which the debts aforesaid should be paid; that the said Sewall may be *compelled specifically to perform* the said bond, and the conditions thereof, by paying off and satisfying said debts of said Orman & Young, as aforesaid, and incurring all the liabilities and contracts as provided in said bond and condition thereof.

The said Ebenezar J. Bower, and John O. Sewall, and Peter W. Gautier, attornies of Rufus Sewall, are also made *parties* to this bill, and the same is sworn to.

On the 3d of January, 1829, his Honor Judge Breckinridge made the following order on said bill:

"On reading and considering the complainants' bill, it is ordered that the writ *quia timet*, as prayed for, issue against the defendant Rufus Sewall, requiring the Marshal to seize and sequester in his hands, until the further order of the Judge acting in equity, the property of the said Sewall specified in said bill as having been acquired by the partnership or purchased with the partnership funds, or to enter into bond to the Marshal in the sum of ten thousand dollars, to save the said Orman & Young, the complainants, from the responsibilities and losses set forth in their said bill, and that the said property shall be forthcoming to answer such demands as the said Sewall has agreed to respond to and satisfy, so as to release the respondents from responsibility therefor, according to the undertaking alleged in the bill, the said complainants giving security in the sum of three thousand dollars to insure all damages which may be occasioned by the issuing of the writ and of granting this order; and it is also ordered, that Peter Gautier be enjoined, until the further order of the Judge, from paying over to the said Sewall any sums of money which may be collected by him from debts due to the firm of Orman & Young or from delivering to the said Sewall any accounts, bonds, notes or securities for the payment of money; and it is further ordered, that the usual writ of subpoena issue to the parties defendants named in the bill, who are required to answer the complaints therein contained."

On the 21st of January, 1830, the said Rufus Sewall *answers* the said bill, in which he admits the partnership according to said articles, and avers that the firm continued doing business after the expiration of the partnership limitation, by and with the consent of the co-partners, until the final settlement, on the said 14th of January, 1829; that being anxious to withdraw and close the concern, he made several propositions, which were not acceded to, and finally directed a schedule of all the property of said firm; that said

Orman & *Young produced to him an estimate of all the debts due and owing to said firm and the debts due and owing by the said firm; that upon *this estimate* the said Orman & Young made the proposal which was acceded to by him, as appears in said bond. In said answer he avers that *since* he had assumed to himself the responsibilities charged in the complainant's bill, he has discovered the grossest errors and misstatements in the schedule rendered him by said Orman & Young, to the great damage of his affairs in the settlement of the co-partnership concerns. He further sets forth in the answer in what those errors and misstatements in said schedule consist, all of which he avers to be contrary to equity and good conscience.

The said Sewall, in his answer, denies that he estimated the liabilities of the firm. He also denies that said Bower was accepted as security, for the reasons stated in said bill; he avers that he was and still is able to comply with his obligations; admits that he has been endeavoring to sell the lands, but denies that from that circumstance he should be suspected of violating his engagements, &c.

After filing the answer, the said Rufus Sewall moved to dissolve the injunction granted, upon two grounds: 1st, because the matters contained in the bill do not warrant the interlocutory order of the Court: 2d, the equity of the bill is denied by the respondent's answer. And on the 5th March, 1830, Judge Breckenridge *ordered* and *decreed* that the injunction and order of sequestration heretofore granted in this case be *dissolved* and *rescinded*.

After the said injunction was rescinded, to wit, on the 27th July, 1830, the said Rufus Sewall filed in the same Court a cross bill, setting forth, in substance, that at the time of the final settlement of the business and division of the profits of the said firm of Orman & Young, he was under pressing necessity for money; that his affairs were embarrassed; that he had made several propositions of settlement

with said Orman & Young without success; that relying on the statements and schedules made by Orman & Young and their representations of the business, he was *compelled* to accept the proposition made by them to purchase their interest at $17,000; that he resided in Alabama and knew but little of the concerns of said firm, and that Orman & Young knew all about it.

The cross bill further sets forth the errors in the statements made by them, the falsity of the statements made, the injury resulting from said contract to him, said Rufus Sewall, and that fraud had been practiced upon him, and prays that the bill be considered in the nature of a cross bill to the bill of Orman & Young pending against him in said Court; that the said Orman & Young be required to answer it, and that *the said agreement* entered into between the said Sewall and the said Orman & Young, for the adjustment of their partnership concern, BE SET ASIDE AND HELD FOR NAUGHT, and THE BOND GIVEN by this complainant and said Bower to said defendants, as aforesaid, be ANNULLED and *given up*, or that the Court will direct the ascertainment of the amount of errors and misstatements, and deduct the same, &c.

Plea and answer to the cross bill was put in by said Orman & Young on the 18th day of December, 1830, denying that any estimate or statement was submitted to said Sewall by them as accurate or correct, showing the condition of the business, or that he was informed by them that the estimates or statements referred to in his bill were accurate. They further say that said Sewall inquired for himself, examined the books, and had access to them when he wished; that all calculations and estimates were general; that no trick or concealment was used to induce said Sewall to purchase; and they aver that had they known the extent of Sewall's embarrassments *they would not have sold to him*; that the business was carried on between them in the way of bargain and sale, in which, for an aggregate amount, they sold the

.aggregate of the co-partnership property, on which sale a balance of each members' share of the concern was not · attempted to be ascertained and they *plead the said bond* and the covenants therein contained IN BAR of .said cross bill.

Another answer to said .cross bill it seems was filed in June Term, 1831, which in substance is about the same as the plea and answer.

Replication to the original bill is filed June Term, 1831.

It also appears on the record that on the 1st July, 1831, Andrew Young appeared in open Court and made *affidavit*, in which he says that judgments have been recovered against them and suits instituted; that most of the creditors decline suing Sewall; that unless by some order of .the Court they are enabled to raise the amounts from the sale of the property and effects of said Orman & Young, *transferred to said Sewall*, as stated in said bill, that a future recovery would avail but little .for said Orman & Young, as he is disposing of his property, with the view of defeating the rights of said Orman & Young; that since the filing of said bill, the said Rufus disposed of a large amount of the notes and .accounts received from said firm, *and received therefor* lands and negroes to a large amount, which he is advised ought also, in addition to the property named in the said bill, to be first subject to the said firm debts in preference to other claims.

On the 18th of December, 1836, the said Orman & Young filed a supplemental bill against Rufus Sewall and others, setting forth, as events which had taken place since the filing .of the original bill, that judgments had been recovered :against them by some of the creditors, and suits instituted by others; that the bond of said Sewall, to pay and satisfy said debts had not been complied with; that there is prop- ·erty consisting of lands, negroes, notes and accounts, derived by said Sewall from said purchase, as stated in said original .bill, sufficient to pay off said demands; that the same *should*

*first be made subject to the payment of said debts*; that the suits are against them, Orman & Young, though it was known to the plaintiffs that said Sewall had bound himself to pay the same, and though it was known to plaintiff's attorney that said Sewall, in his answer to the original bill, expressly stated he was a partner of the firm of Orman & Young at the time said debts were contracted. In the prayer of this supplemental bill they ask that the said suits, when rendered to judgment, may be assigned to them (Orman & Young) and subject to their control, or that the Marshal be ordered to levy the same of the lands and tenements, goods and chattels, of the said Sewall, *or of such lands and. tenements, goods and chattels of said Sewall, obtained from. said firm, or with the proceeds of said firm;* that such decree may be made in relation to the judgment of J. L. Florence, which your orators *have paid*, as may comport with the principles of equity.

Auditors were appointed by the Court to audit the books and accounts of the firm, who made their report, which report was excepted to by Orman & Young.

A mass of testimony was taken under the original bill— some by commission and some before auditors—as appears in the printed record, but which it is unnecessary to set forth, in this statement of the case.

The original bill, the cross bill and plea thereto, and supplemental bill, were set down for hearing *together*.

On the 4th April, 1834, the following decree was entered thereupon in the Superior Court of Jackson county, to wit :

"The bill and answers in the above cases, the plea to the cross bill, report of auditors and exceptions thereto, together with the evidence, exhibits and proofs being read and heard at the same time:

"1st. It is ordered and decreed, that the exceptions to the report of the auditors be sustained and the report set aside.

"2d. It is ordered and decreed, that the plea to the cross-

bill be sustained and the bill dismissed; and it appearing by
said original bill and answer, and the exhibits and proofs,
that the said respondent Rufus Sewall received of the firm
of Orman & Young, the complainants, the several lots
of land in said bill mentioned, and that he purchased and
acquired the several other lots and parcels of land and
negroes in said bill mentioned with the funds and means
of said firm, as specified in said bill; and it appearing
that the following debts have been paid off and satis-
fied by said complainants by virtue of judgments of the
Superior Court of Jackson county, to wit: a judgment in
favor of J. L. Florence, obtained at the June term of said
Court, 1830, for $567.56 principal, and the sum of $33.37
costs; a judgment in favor of Augustus Whiting, Courtland
Palmer and Robert Stark, merchants and co-partners, trad-
ing under the firm of A. Whiting & Co., obtained at the
June term, 1831, for $1,349.92 principal, and the sum of
$31.59 costs; a judgment in favor of Henry Parish, Peter
Corney, Jr., William A. Gasquet and James A. Gasquet,
merchants, trading under the firm of William A. Gasquet,
&c., obtained at the June term, 1831, for $934.35 principal
and the sum of $22.22 costs; a judgment in favor of Joseph
Brewster and Lemuel Brewster, merchants, trading under
the firm and style of J. & L. Brewster, obtained at the June
term, 1831, for $338.12 principal and the sum of $15.98
costs; a judgment in favor of Harteman Hill and Howard
Henderson, merchants and co-partners, trading under the
firm of Hill & Henderson, obtained at the December term,
1831, for $242.10 principal and the sum of $26.66 costs; a
judgment in favor of William Taggard and Tobias Lord,
merchants and co-partners, trading under the firm of Wil-
liam Taggard & Co., obtained at the December term, 1833,
for $427.12 principal and the sum of $10.40 costs, and the
following judgment in favor of Peter W. Gantier, Jr., ob-
tained in the County Court of Jackson county, at the April

term, 1833, for $80 principal and ——— costs, and the following judgment in favor of Peter W. Gautier, Sr., obtained in a Court of a Justice of the Peace, before Benjamin Hogg, Esq., of Jackson county, for $48 principal and the sum of ——— costs; and that they have paid off and satisfied the following debt without suit, to wit: Kopman & Hyers' account, paid 13th June, 1829, for $27.15; and that the following debts are still due and unpaid, viz: a debt due to William Sheldon and Samuel D. Dixon, merchants and partners, trading under the firm of Sheldon & Dixon, now in suit on a note of $128.69 and the sum of $69.59 interest, and a debt due Robinson & Booth by note, dated in May, 1828, for $71.36, or thereabouts, with interest, all of which were contracted before the 14th January, 1829: It is therefore ordered that the Master *ascertain* the amounts *so paid* under judgments of said Court, calculating the interest on said judgments from the date threof up to the date of this decree; that he *ascertain* the amount paid under the judgment of the County Court of Jackson county, and in said Justice Hogg's Court, calculating the interest from the 1st May, 1833, up to the date of this decree, AND ALL SUMS due and owing by said complainants as aforesaid contracted before the 14th January, 1829, and the amount so ascertained it is hereby ordered, adjudged and decreed be *paid* to said complainants by the said respondent, and that the partnership property received by said respondent, or which was purchased or acquired by and with the funds of the co-partnership, be, in the first instance, applied to the discharge of the complainants' demand, *ascertained as above;* and in default of the payment of the said sum within twenty days of the date of this decree, it is further ordered, adjudged and decreed that the said complainants have their execution for the said sum, and that they be and hereby are substituted and shall stand in the place of the several creditors aforesaid, and that the execution issued as aforesaid be levied and

executed upon all or so much thereof of the property afore-
said as will be sufficient to satisfy and pay the same so ascer-
tained by the said Master according to the directions of this de-
cree, and that the Marshal give legal notice of the time and
place of sale; and it is further ordered, that so much of said
sum and amounts as have *not been paid* by the complainants
be by the Marshal paid into Court to *await the further order
of the Court*, and the balance paid over to the complainants
or their solicitor; and it is further ordered, adjudged and
decreed that the said complainants recover of the respon-
dent their costs in this behalf incurred, and that the same
be taxed by the Master."

From this decree the said Rufus Sewall *appealed* to the
Court of Appeals of the Territory of Florida, consisting of
the Judges of the several Superior Courts in the Territory,
which appeal was heard at Tallahassee on the 1st day of
February, A. D. 1838.

*One of the Judges dissenting*, the majority of the Court
entered the following order as the opinion of the Court:

"The Court having maturely considered the transcript of
the record of the decree aforesaid, submitted at the last term
of this Court, and arguments of counsel then heard, and be-
ing now fully advised of their judgment to be given in the
premises, doth order, adjudge and determine that *so much*
of the final decree rendered in this cause by the Superior
Court of Jackson county, while sitting in chancery, as sub-
stituted the appellees for and in the place and stead of the
creditors of Orman & Young as relates to the debts due from
said firm which had not been paid by the said appellees at
the time said decree was rendered, be and the same is here-
by reversed, and that so much of the said decree as author-
izes and directs that the said appellees have *execution* against
the appellant for the amount which the Master shall subse-
quently ascertain to be due from the said appellant be and the
same is also reversed, and that the said decree in all other

things be and the same is hereby affirmed; and it is further ordered and adjudged that this cause be *remanded* to the said Superior Court of Jackson county for such further and other proceedings and decree as that Court shall deem right and proper, according to the principles of equity, between said parties, conforming in said proceedings and decree to the principles laid down and established by this Court in said cause; and it is further ordered that the appellant recover of the appellees his costs herein expended, and the said cause be remanded accordingly."

The mandate being sent down to the Court below, on 30th May, 1844, the cause was again docketed in the Superior Court in and for the county of Jackson. In 1845 Florida was admitted into the Union as a State, and under the Constitution of the State and the acts organizing the same the Territorial Superior Court was abolished and Courts called Circuit Courts established, having jurisdiction of chancery cases.

This cause came on again to be heard in the Circuit Court of the State, in said county of Jackson, on the 9th of May, A. D. 1846, and that Court then entered the following decree, to wit:

"And now, at this Term, came the said parties, and the judgment and decree of the Court of Appeals of January Term, 1838, being exhibited, whereby the judgment and decree of the Superior Court, in the Western District of the Territory, sitting in and for the county of Jackson, as a Court of Equity, passed and made on the 4th day of April, 1834, was in so much reversed, viz: So much as substituted the said Thomas Orman & Young, for and in the place and stead of the creditors of Orman & Young as relates to the debts due from said firm which had not been paid by them at the time the said decree was rendered, and so much of the said decree as authorizes and directs the said Orman &

4

Young to have execution against the appellant, Rufus Sewall, and the said decree in all other respects and things was affirmed, and the said cause was remanded to the said Superior Court for further proceedings; and it further appearing that this cause was, by an order of the Superior Court of the Apalachicola District, sitting in and for the county of Jackson, docketed on the equity side of this Court, in the name of Thomas Orman, survivor of Andrew Young, and of Samuel Stephens, Esq., Sheriff of said county of Jackson, *ex officio* administrator of the said defendant, Rufus Sewall, deceased; and it further appearing that Sears Bryan, Esq., Clerk and Master of the said Superior Court, did on the said fourth day of April, 1834, report that there was due the said Orman & Young, for principal and interest of the sum of money paid by them, said Orman & Young, and due and owing to the creditors of the said firm, the sum of five thousand three hundred and twenty-one dollars and thirty-six cents, of which sum two hundred dollars and five cents principal, and one hundred and eight dollars and fifteen cents interest, making three hundred and eight dollars and twenty cents, was the amount yet due and owing to the creditors of the said firm; and it further appearing that no exceptions have been filed to the said report of the said Sears Bryan, Clerk and Master,—

" On the motion of Leslie A. Thompson, solicitor and of counsel for the said complainant, it is ordered and decreed that the said report be ratified and confirmed, so far as it ascertains the amount paid by the said complainant and the said Andrew Young, and ascertained to be the sum of three thousand nine hundred and eighty-seven dollars and fifteen cents, for principal, and the sum of one hundred and forty-one dollars and twenty-two cents costs, and the interest on said two sums, up to the said fourth day of April, 1834— eight hundred and forty-seven dollars and forty-two cents— making an aggregate of four thousand nine hundred and

seventy-five dollars and thirty-nine cents, paid by compulsion of suit; and the further sum of thirty-seven dollars and seventy-seven cents, for principal and interest, up to said time, paid without suit, making an aggregate sum of five thousand and thirteen dollars and sixteen cents, the amount so found due said complainant, survivor as aforesaid, with legal interest thereon, from the date of said report, to wit: the fourth day of April, A. D. one thousand eight hundred and thirty-four, within sixty days from the date of this decree; or in default thereof, that Wade Keyes, Esq., one of the Masters in Chancery of this Court, do proceed to make sale of the several tracts and parcels of land in complainant's said original bills specified and ascertained by the said decree of the Superior Court of Jackson county to have been purchased with the said partnership funds, and subject to the payment of the said debt due said complainant—the said Master to give thirty days public notice of the time and place of such sale. He shall sell the said property for cash, and pay to the said complainant survivor, as aforesaid, the said sum of money so due him, as aforesaid, with its interest; and that he make report of said sale at the next term of this Court, and pay the surplus money, if any, arising from said sale, after paying, first, the expenses of said sale, and the costs of suit, and then the said complainant, survivor as aforesaid, be paid into Court, to abide its further order."

"*Dated, 8th May,* 1846."

The cause comes to this Court on an appeal from this last decree.

The appellant, by his attorneys, assigns the following errors in the record and proceedings of the decree aforesaid:

1st. The Court erred in giving a decree for complainant below; the decree should have been for defendant, dismissing complainant's bill.

2d. The substitution asked for is an anomaly in legal pro-

ceedings, without precedent or justification in right or reason, and impossible to be carried into effect.

3d. There is no such lien in law or equity as is asserted by the bill; the complainants had taken security, and there is no authority in the Court to give them an additional one.

4th. The Court had no jurisdiction of the case, being one neither of mistake, accident, fraud nor trust.

5th. The decree does not pursue the mandate of the Court of Appeals; there was no report of a Master in conformity thereto, and a report was directed to be made before rendering a final decree.

6th. The whole proceeding is irregular, illegal, defective and improper, as far as the action of the Circuit Court is concerned.

*Thos. Baltzell* and *M. D. Papy* for appellant.

*A. H. Bush*, *Richard F. Campbell* and *C. C. Yonge* for appellees.

FORWARD, J., after reading the statement prepared by him, proceeded to deliver the opinion of the Court.

It is contended by the counsel for appellant, and conceded by Mr. Bush, one of the solicitors for appellee, that the first error assigned, which is, that the decree should have been in favor of the respondent in the Court below instead of the complainant, opens the entire record for the consideration of the Court, and renders necessary an examination of this cause upon its merits, and the cases of LeBaron & Colquitt vs. Fauntleroy et al., 2 Florida, 276, and Life Ins. and Trust Co. vs. Cole, 4 Fla., 362, are cited to maintain this position.

Were this cause now for the *first time* before a Court of Appeal, these cases would be conclusive, under the act of February 10th, 1832, which gives authority to the Appellate Court to pronounce "*such judgment, sentence or decree as the Court below ought to have given.*" An appeal in

equity is substantially a re-hearing of the cause, and the appeal opens the whole case as it is presented in the record, or it opens for consideration all prior or interlocutory orders or decrees connected with the merits of the final decree. But this case has once been acted upon by an Appellate Court, and in consequence thereof we are involved in some difficulty in determining how much of the case is opened by this appeal.

The first question presented by the statement of the case, as appears by the record and proceedings, is this: Is the decision of the Court of Appeals of the Territory of Florida, given at January term, 1838, upon an appeal then pending from an order in this cause, obligatory upon this Court, so far as to *confine* this Court to a review of proceedings *subsequent* to the mandate of that Court, or whether this Court can go behind that mandate and the decree of the Superior Court affirmed, and render a decree according to its own view of the merits of the case? This leads us to inquire how the decree of 1834 by the Superior Court, and the decree of the Court of Appeals of 1838, affirming in part said decree, are to be viewed. If they are together a *final* judgment in the cause, then this Court will be estopped from going behind the mandate of the Court of Appeals, however much we may differ as to its provisions. Bret vs. Ming, 1 Florida, 454.

In determining whether these two decrees are together a *final* decree, we are led, from the view which this Court takes of them, to inquire:

1st. Whether the Court of Appeals in 1838, under the laws then in existence, had jurisdiction of the cause, and whether their adjudication is not altogether *coram non judice*.

2d. Whether, admitting the Court of Appeals had jurisdiction, their decree, together with the decree of the Superior Court, is anything more than an interlocutory decree,

and examinable by this Court like all other interlocutory decrees, and whether the last decree (that of Judge Douglas) in this case was the final decree.

In examining the first question it will be borne in mind that when that appeal was taken there was no statute of Florida authorizing appeals from interlocutory decrees as there now is, but the law was: *"That if a party in either of the Superior Courts of this Territory shall feel aggrieved by a final judgment, sentence or decree, made or pronounced by any or either of said Courts, it shall and may be lawful for such party, &c., to obtain an appeal to the Court of Appeals,"* &c. See Duval's Compilation, page 108.

From this it will be seen that to give the Court of Appeals jurisdiction and give their acts validity, it was neces-sary that the decree of the Superior Court appealed from should have been a FINAL decree.

What is a "FINAL decree?" Blackstone, in his Commentaries, says: "It very seldom happens that the first decree can be final, or conclude the cause." In speaking of things which retard the completion of decrees, he says: "Frequently long accounts are to be settled, incumbrances and debts to be inquired into, a hundred little facts to be cleared up, before a decree can do full and sufficient justice. These matters are always, by the decree on the first hearing, referred to a Master in Chancery to examine, and then he is to report the facts, as they appear to him, to the Court. This report may be excepted to, disproved and overruled, or otherwise is confirmed and made absolute, by order of the Court." 3 Black. Com. page 353.

"A decree is *final* when all the circumstances and facts material and necessary to a complete explanation of the matters in litigation are brought before the Court, and so fully and clearly ascertained BY THE PLEADINGS on both sides that the Court is enabled from THENCE to collect the respect-ive merits of the parties litigant, and upon a full considera-

tion of the case made out and relied upon by each, determines between them according to equity and good conscience."

"A decree is *interlocutory* when it happens that some material circumstance or fact, necessary to be made known to the Court, is either *not stated in the pleadings* or so imperfectly ascertained by them, that the Court, by reason of that defect, is unable to determine FINALLY between the parties; and therefore a reference to or an inquiry before a Master," &c. 1 Harrison's Ch. Pr., page 420.

"But a decree is *final*, in the sense of the rule, which finally adjudicates upon all the merits of the controversy, and leaves nothing further to be done but the execution of it." Story's Equity Pl., § 408.

.It is said by Judge Spencer, in Jaques vs. Methodist Episcopal Church, 17 Johnson, 558, that no case can be found in which a decree directing a reference to a Master, or a feigned issue, for the purpose of ascertaining any *material fact* in. the case, has been held to be a final decree.

A decree to refer is not *final*. There must be a report: and a final decree upon it. 10 Vesey, 34; 2 Cranch, 33.

It is true the decree of the Superior Court does not direct the Master to report; but it does reserve questions until the coming in of the report; to wit, the disposition of so much of said sum and amounts as have not been paid. But does. this dispense with the necessity of a report or confirmation of the report?

It seems it was thought necessary to have a report and confirmation of it, as Judge Douglas required, before he would enter a final decree in the Circuit Court.

This reference to the Master was not merely to calculate· interest or state an account upon *fixed data*. On the contrary, he was to "ascertain the *amount still due and unpaid*,. with the INTEREST thereon, up to the date of this decree,. *and all sums due and owing by said complainants as afore-*

*said, contracted* BEFORE THE 14TH JANUARY, 1829." He was also to ascertain " the *amounts paid* under the judgment of the County Court and in said Justice Hogg's Court."

If this is not a reference for the purpose of ascertaining material facts, we are at a loss to define what would be one. If the report of the Master, on ascertaining these facts, does not require confirmation before final decree, we cannot conceive a case that would require it. Again, from what source was the Master to ascertain " *the amounts so paid under judgments of said Court*," &c., &c.? Was he to gather this from the pleadings? Were these facts " fully and clearly ascertained by the *pleadings* on both sides, that the Court was enabled from *thence* to collect," &c.? No. It does not appear from the *pleadings* that any debts were paid by said Orman & Young. On the contrary, their payment was made after the original bill was at issue, and was made known to the Court by proofs and not by pleadings. Being imperfectly ascertained, the Court referred the cause to a Master.

It follows as a matter of natural consequence that the Master was to make special report of these things to be confirmed, before a final decree, and it certainly is the practice. See 2 Smith's Ch. P., 359.

In Scott vs. Livesey, Eng. Chan. Rep., vol. 1, 467, it is laid down that wherever exceptions will lie to the Master's report, it must be regularly confirmed before any order can be made upon it. A report approving a conveyance after order for sale is the only exception.

This decree further directs that the partnership property received by said Sewall, or which was purchased or acquired with the partnership funds, (not stating in the decree any property, real or personal, thus received or acquired,) be in the first instance applied to the payment of the sums decreed. Execution is by the decree awarded to the *complainants*, and directed to be levied on said property, (no where

specified or described,) so as to raise the amount due complainants (when ascertained.)

We are aware of the length to which the Supreme Court of the United States has gone, in defining the properties of a final decree, so as to admit of an appeal, and some of the provisions of this decree import *pro tanto* finality, according to those tests. But when we consider that material facts were referred to the Master to ascertain; that the further order of the Court is reserved, and that the decree does not specify the property, the *rem*, to be sold, on which the alleged *lien* did attach, it will be seen that those tests will not work this into a *pro tanto* final decree. Young et al. vs. Smith et al., 15 Peters, 287. The decree was incapable of execution without some further action of the Court. Could the Court of Appeals have pronounced a final decree in the cause before it? It certainly could not, and *it did not*, as will be seen by reference to it. Although they provided for execution and sale, no property was specified, and they sent the case back to the Court below, with the same reference to Master as to amounts paid; and in the opinion of the Court of Appeals—see page 100 of printed record—the Court say:

"The Master should have been directed to make his report to the Court, so that the appellant might have had an opportunity of taking such exceptions to it, if any there were, as would have been legal and proper *before a final decree was rendered* upon which execution would issue."

In the case of Putnam vs. Lewis and wife, 1 Florida, 474, our own Court decided a decree for partition of land, which was made by consent, and all the equities between the parties settled, the quantity of land each claimant was entitled to defined, but which appointed commissions to make partition of the land in conformity thereto, to be an interlocutory decree. That case does not present equities unsettled and material facts unascertained, as does the one we are now

considering. ·See also Bellamy et al. vs. Bellamy, 4 Florida, 243.

Thus it will be seen that neither our own nor any of the other decisions would sustain us in holding the decree of the Superior Court in 1834 a final decree. It not being a final decree, the Court of Appeals acted prematurely, and the cause was never properly in the Court of Appeals.

Supposing, however, the Court of Appeals had jurisdiction, what is the character of their decree? Was it a final or interlocutory decree? From the rules and tests we have already laid down, there is no question but that it was an interlocutory decree, continuing the reference as to specified portions thereof affirmed, and calling for the report of a Master, confirmation thereof and entry of *final* decree thereupon by the Court below.

As the case is now up again before a Court of Appeals, can this Court revise and reverse the former ruling of the Court of Appeals?

We have already decided that there has been no final decree in this cause, excepting the one now appealed from, to wit: the decree of the Court in 1846 by Judge Douglas.

This Court, having jurisdiction of the cause, on an appeal, and there being no final judgment, the whole case is open for consideration on the merits connected with the decree from which appeal is taken, and this, too, notwithstanding the interlocutory decree of the Superior Court was in part affirmed by the Court of Appeals, which was done in the case of Price, Executors, vs. Nesbit, 1 Hill's Chancery Reports, (South Carolina,) page 454, under principles cited in said case, and also in Jaques vs. Methodist Epis. Church, 17 Johnson, 549.

Having decided that the opinion of the Court of Appeals, and its decree in 1838, is not obligatory upon this Court, and that the last decree (that of Judge Douglas) in this case was the final decree, the next question is whether

there was error in the preceding interlocutory decrees connected with the merits of the final decree.

By the partnership articles, Orman & Young and Sewall agree to enter into partnership for two years in the mercantile line. The business to be done under the name, style and firm of "Orman & Young."

Of course, under this agreement, all contracts by and with the firm, within the legitimate sphere of their business, although under the name and style of Orman & Young, Sewall, the dormant partner, is bound for and liable at law, if he shares the profits thereof. 9 Pickering, 272; Livingston vs. Roosevelt, 4 Johnson, 267; Beckman vs. Drake, 9 Meeson & Welsby, 92; Saville vs. Robertson, 4 T. R., 725; Armstrong et al. vs. Hussey et al., 12 Sergt. & Rawle, 317.

It appears in this case that the contracts and notes were made in the firm name, "Orman & Young." Therefore Sewall could be joined with the acting partners in an action at law, and the plaintiff could aver in his declaration that Orman, Young and Sewall composed the firm of "Orman & Young." Loyd vs. Ashby, 2 B. & Ad., 23; 5 Peters, 562.

If Orman & Young, on being sued alone, desired to have Sewall joined with them, they should have plead the nonjoinder, as was their duty.—11 Richardson's Law Rep., 484.

There are conflicting rulings whether the acting partners alone being sued on a note, could plead the non-joinder of the dormant partner; but where he was known to the creditor at the time of the contract, there is no question but that a plea in abatement would be sustained, because he put faith in him also.—Dubois vs. Subert, 5 Taunt, 609; De-Mautort vs. Sanders, 1 B. & Ad., 398.

Orman & Young having suffered judgment against themselves alone, and the creditors, with the knowledge that Sewall was a partner, having taken their judgments in this manner, the recovery should be treated as a recovery on a

several contract, and not as a bar to Sewall.—6 Cranch, 253; 11 Richardson, 484.

Was there anything to inhibit the creditors from suing all the partners at law?—Sewall was bound *in extenso* as well as Orman & Young. Was there anything to prevent them from suing Sewall even after their judgment?—A judgment against the two partners, Orman & Young, would be no bar to an action against all three of the partners.

In the late case of the Union Bank vs. Hodges & Smith, 11 Richardson's Law Rep., 480, assumpsit was brought on a note, signed "A & B," payable to their own order, and endorsed by them, and judgment recovered. Afterwards, the plaintiff finding that C was a *dormant* partner, sued all three upon the note. A & B pleaded a former recovery, but the Court of Appeals overruled the plea.—See, also, Sheehy vs. Mandeville, 6 Cranch, 253; Watson, Crews & Co. vs. Henry Owens & Co., 1 Richardson's Law Rep., 111.

There is no allegation or proof that any of the members of the firm was insolvent at or since the institution of the suit; and suppose any or all were insolvent, still they could be sued at law and the creditors could not enter the Court of Chancery till they had first obtained a judgment at law and got a return of *nulla bona* on the *fi. fa.* Yet, by the decree in this cause, Orman & Young are substituted for the creditors and given a standing in equity against Sewall, reaching his property which they had sold him, a position that the creditors themselves could not have maintained, enforcing judgments against Sewall to which he was not a party, giving as a reason for this substitution that, although Orman & Young took the bond of Sewall, with SECURITY, to pay the debts of the firm, nevertheless Orman & Young were sued alone by the creditors and paid debts under the judgments, and that no recovery could be had against the secret partner Sewall *at law* by the creditors.

But, it is contended by counsel for appellee that the credi-

tors had a lien upon the partnership property and the property purchased with the funds of the firm for the payment of their debts. What lien had they? When they sold goods to the firm of Orman & Young and delivered them, their lien was gone, the contract was executed on their part, and just as soon as Orman & Young gave their note or promise, it was complete on their part—nothing remained but to pay the money. And who was bound in law to pay it? The firm; Orman, Young and Sewall. They had, when they recovered judgment, a lien upon any property which was subject to the execution thereupon, the same as any other person on judgments for property sold, but they could not reach property in equity until they had exhausted their law process. The creditors had nothing to do with the bond given by Sewall to Orman & Young. That was Orman & Young's *indemnity*—their *security*. That security could be enforced by them.

In view of the facts, what was this substitution? It was substituting Orman & Young in the place of the creditors against Orman & Young—certainly an anomaly. To do what? To use the executions of the creditors of the firm issued upon judgments in which Sewall was no party and subject the property sold by them to Sewall in payment thereof. The facts of this case do not warrant any such subrogation or substitution. It is inapplicable. The equitable doctrine of subrogation or substitution can only be resorted to, says Chancellor Walworth, "in cases where the person advancing money to pay the debt of a third party stands in the situation of a SURETY, or is compelled to pay it to protect his own rights, that a Court of equity substitutes him in the place of the creditor as a matter of course without any agreement to that effect."—Sanford vs. McLean, 3 Paige, 117; 40 vol. Law Library, pages 92, 101.

In what way did Orman & Young stand as *surety* for Sewall with the creditors? Whose creditors were they? Were

they not the creditors of Orman & Young? Did they advance money to pay the debt of Sewall? No, they advanced money to pay their own debt as well as Sewall's. It is true that Sewall had agreed with them, Orman & Young, to pay these debts, and given his bond and security to that effect, but no arrangement had been made with the creditors. They had not taken him as principal and Orman & Young as *surety*. We have already seen that nothing in the pleadings and proof show that they were compelled to pay the debts to protect their own rights. Had they plead the non-joinder of Sewall in these suits, they would have had his property equally liable with their own; or, as they *paid* debts, they might, by suit for breach of the bond, have attached Sewall's property. Had Orman & Young taken no bond or promise from Sewall that he would pay the debts, then, on payment, they would have been entitled to contribution; but they sold and delivered the effects of the concern to Sewall, and took his *bond* and *security*, and executed a conveyance with *warranty* against their claim. The effects by the sale became his, and he could dispose of them as he thought proper.

The creditors are not parties to this suit. There is no allegation that either Sewall or Orman & Young are *insolvent*, nor are the creditors seeking to show collusion or fraud, yet the Court substitutes Orman & Young for them and fancy that the creditors had and have a *lien* on the partnership property notwithstanding the sale to Sewall.

This leads us to consider the doctrine of the creditors' *so called* lien on partnership effects. During the continuance of the partnership the joint creditors have no lien. The nearest they approach it is a right to sue at law and subject the property.—*Ex parte* Ruffin, 6 Ves., 126; 11 Ves., 5.

But until then they cannot prevent the partners from effectually transferring the partnership property by *bona fide* sale, and if sold *bona fide*, joint creditors cannot follow it.

Campbell vs. Mullott, 2 Swanston, 576; 10 Vesey, 347; 1 Maddock, 533.

The Master of the Rolls, in delivering his opinion in the case in 2 Stwanston, says: "The circumstance of its having been joint property does not render it such forever, *or prevent its being effectually aliened to two or one of the partners.*" This is the case now under consideration. See this doctrine summed up in Story on Partnership, sections 358, 359, &c.

In section 359, says Story: "The reason is, that in such a case the retiring partner who so transfers his share has *no lien* on the property for the discharge of those debts; *for, by his voluntary transfer thereof he has parted with it and trusted to the personal security and personal contract of the other partners.*" And in section 360 the commentator says: "And it is thus through the operation of administering the equities between the parties themselves that the creditors have the opportunity of enforcing this *quasi lien.*" Thus it will be seen their *agreement* will be enforced according to the equities between the partners. This is irrespective of any provisions of the statute of King James.

It is contended by the counsel for the appellee in support of the decree that said Orman & Young had an equitable lien upon the partnership property for the amounts which they paid for the firm, and therefore the misapplication of the principle of *substitution* to this case is not fatal to the decree.

There is no doubt, as a general principle, that each of the partners have a specific *lien* on the partnership stock not only for the amount of his share, but for monies advanced by him beyond that amount for the use of the co-partnership, and that this lien extends to property purchased with the partnership funds as well as that standing in the partnership name.

This lien would be enforced if the partners had not entered into an *agreement* that the partnership stock should

become the exclusive property of one of them (Sewall), and that Sewall should pay all the debts, and for security that he would do so, an indemnity bond taken. Lingen vs. Simson, 1 Sim. & Stu. Rep., 600.

It will be borne in mind that the partnership property was not left in the hands of Sewall to pay the debts with, he assuming a trust. On the contrary, the same is *bona fide* sold to him. A conveyance to him is executed by Orman & Young, in which they covenant to warrant and defend him against their claim. The partnership is dissolved—a final settlement made—a sum of money paid—an agreement entered into between the partners, in which the creditors are not parties, that said Sewall, as a part of the purchase money, will pay all the debts, not specifically out of the partnership property, but that he would pay them, and as an indemnity against their suffering damage, he executes a bond with security. The fact of taking this bond, with security, and the fact of the other party covenanting to warrant and defend against their claim, seems to us conclusive that it was the *intention* of the parties that the effects assigned to said Sewall should be appropriated to his *private use*. Orman & Young admit this in their answer to the cross bill. They say that if they had known how much embarassed Sewall was they would not *have sold to him.*

The case of Deveau vs. Fowler, 2 Paige, 401, cited by counsel for appellee, is a strong case, and at first view would seem to clash with the English decisions and Judge Story, that an assignment of the partnership effects by one partner to another is a destruction of the lien. And so with some of the other cases cited. But it will be seen that all the Chancellor decided in that case was, that the partnership property should be applied in the *manner stipulated in the agreement*, and in the opinion the language of the Chancellor is: "The fair presumption, in the absence of any *express agreement* to the contrary, therefore is, that it was not the

*intention* of the complainant that the effects assigned to the defendant should be appropriated to the private use of the latter, leaving the debts of the firm unpaid."

In the case of Vendor's lien, where *security* is taken, the presumption of law is that the vendor waived his lien, and relied on the security, and so it has been held by our Court. See Marvin vs. Bradford, Admr., 2 Florida Rep., 463. So in this case, the taking of *security* must be presumed a waiver of the lien, or at least an expression, *prima facie*, of the *intention* that the effects assigned should be appropriated to the private use of the purchaser.

The weight of authority seems to be, in America as well as in England, that partners may effectually transfer their joint property to one another by *bona fide sale*, and that such a sale destroys the lien.

We think in this case that Orman & Young did make such a sale to said Sewall, in consequence of which the property is not still the property of the partnership, and therefore the decree is erroneous, and should be reversed and set aside.

The appellant, by his attorney, claims that the decree in the Court below should have been for defendant, dismissing complainant's bill.

This objection to the jurisdiction of the Court comes too late, in any event.

The appellant submitted to the jurisdiction of the Court by answering the bill, filing cross bill, and then moving to dissolve the injunction. He should have demurred to the bill, if he wished to contest the equity in it. Grandin vs. LeRoy, 2 Paige, 509; 2 John. Ch., 339; 4 John Ch., 287.

We think, however, the Court did not err in retaining the bill, irrespective of the fact that it was answered.

What was the nature and objects of this bill? It was a bill of *quia timet*, and for specific performance of an indemnity bond.

6

Blackstone, in his Commentaries, says a Court of Equity may entertain a bill of *quia timet* for the purpose of preventing a possible future injury, and thereby quieting men's minds and estates, &c. 3 Black. Com., 331; 2 Story's Equity Jurisprudence, § 826.

And in the case of Champion vs. Brown, 6 Johnson's Chancery, 406, it was decided that equity may decree the performance of a general covenant of indemnity, though it sounds only in damages. 1 Fonblanque, 43, and note; also, see Ranelaugh vs. Hayes, 1 Vernon, 189; 4 Dessausure, 44.

What is a covenant of indemnity? In 2 McCord, 279, the Court define "indemnity" to be "what is given to a person to prevent his suffering damage."

We think the bond in this case contains a general covenant of indemnity, and sounds only in damages, and comes within the jurisdiction of a Court of Equity, and unless the bond is set aside or cancelled, the Court below, under this bill, should decree a specific performance thereof, and in enforcing the decree may execute it on any property belonging to the estate of Sewall which may be found applicable for that purpose. We think that there is enough stated in the bill to call upon the defendant to answer.

We are also of the opinion that the Court below erred in sustaining the plea to the cross bill and dismissing it.

This cross bill was filed for the express purpose of relief against the bond and agreement which is endeavored to be enforced by the original bill. It charges fraud, concealment, misrepresentation and imposition on the part of the obligees. Its prayer is that the bond be annulled and given up, and the agreement entered into between them for the adjustment of the partnership concern be set aside and held for naught,

Chancery may order an instrument to be delivered up to be cancelled, whether it is or is not void at law, and whether it be void from matter appearing on its face, or *from proof*

*taken in the cause.* Hamilton vs. Cummings, 1 John. Ch., 522, and cases reviewed.

The grounds upon which a Court of Equity will grant relief against agreements and bonds founded in fraud, imposition and misrepresentation, are well defined in all our text-books. We are at a loss for what reason the Court below refused to enter into the enquiry presented by the cross bill, answer thereto and proofs taken under the same, and sustained the plea setting up the *very* bond and agreement, against which relief was sought, as an estoppel.

This case of *antiquity* has dragged its length through a series of judicial changes, and gladly would we arrest its career, but we think the ends of justice require that the cross bill be reinstated, the judgment of the Court below sustaining the plea of estoppel vacated and the cause remanded to the Court below, to enquire from the proofs taken or to be taken in the cause whether the relief prayed for in said cross bill should be granted.

Under the general powers granted by the Legislature, this Court might upon the record make such a decree on the original bill, cross bill and supplemental bill, which are set down for hearing *together*, as the Court below should have made, but it is to be considered that the *Constitution* of our State makes us an Appellate Court *only*. The Court below not having passed upon the relief prayed for in the cross bill, we think it would be exercising a doubtful jurisdiction for this Court to act upon it until that is done. Besides, the parties may now desire to take further testimony. The Court below might, upon application, if thought proper, open the case again for further testimony.

If, upon a hearing of the cause below, the Court should be of the opinion the agreement should be annulled and the bond delivered up to be cancelled, then it will be a matter of account and *contribution* between the partners.

If, however, the Court below should refuse the relief asked

in the cross bill and sustain the bond and agreement, then it will treat it as a bond of indemnity sounding in damages, and decree a specific performance directing a reference to a Master to tax the damages and decreeing the administrator of said Sewall to pay the same within a reasonable time out of assets of the estate of said Sewall in his hands to be administered.

The decree of the Circuit Court is therefore reversed and set aside, and this cause remanded to the Circuit Court of Jackson county for such further and other proceedings and decree as that Court shall deem right and proper, according to the principles of equity between said parties, conforming in said proceedings and decree to the instructions and principles laid down and established by this Court in said cause, and that the appellant recover of the appellees his costs herein expended.

And it is further ordered that the Clerk of this Court do prepare a transcript of this judgment, duly certified under his seal of office, and that he forward the same to the Deputy Clerk of this Court at Marianna, with instructions to enter the same on the minutes of the Court at that place as of the March term, 1860.