THOMAS H. AND THEOPHILUS WEST, APPELLANTS, VS. JAMES A. CHASTEN, APPELLEE.

A, B, and C, being partners, agree upon a dissolution; B and C assign and transfer all their interest in the joint property to A, who assumes the payment of the joint debts, and covenants to save B and C harmless.

*Held:*

1. That the property ceases by such agreement to be joint property, and that the lien or equity of the retiring partners to have a sale of the property, and an application to the joint debts, is destroyed.

2. That as between C and A a relation analogous to that of principal and surety exists by virtue of A's assumption of the debts and his covenant, and that, saving the rights of the joint creditors, C has the standing of a surety in a court of equity.

3. When the liability of a surety has attached in consequence of the default of the principal, the surety who has been sued by the creditor may apply to a court of equity and compel the principal to relieve him from his liability.

4. Where the Chancellor has, upon a bill filed by the surety in such a case, appointed a receiver to take charge of the old stock and such property as has been purchased by the proceeds of sales of what was once joint property, this court will not direct such order to be vacated unconditionally in a case where the principal debtor has transferred a portion of his money to another State, and is doing such acts as indicate an intention to disregard his covenant, and which if not checked will result in loss to the surety. Such an order should be vacated only on such terms as would secure the application of such property to the payment of the joint debts to the relief of the surety.

Appeal from a decree of the Judge of the Circuit Court for the First Judicial Circuit, sitting in and for the county of Jackson.

A statement of the case is contained in the opinion of the court.

*C. C. Yonge,* for Appellants.

*Hawkins and Bush,* and *Mc Clellan and McLean,* for Appellee.

WESTCOTT, J., delivered the opinion of the court.

Thomas H. West and Theophilus West, defendants, and the complainant, James A. Chasten, formed a mercantile copartnership in the month of November, A. D. 1867, under the name of West, Brother & Co.

On the 10th of February, A. D. 1868, the partnership was dissolved, and an agreement entered into between the remaining partner, Thomas H. West, and the retiring partner, James A. Chasten, by which the remaining partner assumed the debts of the firm, and covenanted and agreed to save the retiring partner harmless therefrom, the retiring partner transferring and assigning all his interest in the goods to Thomas H. West, the remaining partner.

An agreement substantially similar to this was entered into between Thomas H. West and his brother, Theophilus West, at the same time.

The joint debts having become due, the retiring partner, James A. Chasten, eight months after dissolution, files this bill against Thomas H. West and Theophilus West, alleging that he has been sued for the joint debts; that he has been threatened with involuntary bankruptcy; that Thomas H. West is sending his cash beyond the State, &c. He sets forth the agreement upon the dissolution, and prays "a decree that Thomas H. West do specifically perform his covenant;" that he may be enjoined and restrained from any further disposition of the goods transferred upon the dissolution, alleging that he still has a considerable amount of the stock on hand; and that a receiver be appointed to take possession of the goods, to sell them and apply the proceeds to the payment of the debts of the late firm, unless the defendant, Thomas H. West, shall give security to dispose of the goods, and apply the proceeds to the payment of the debts of the firm and for general relief.

Upon the filing of the bill, an injunction is granted, and a receiver is appointed to take charge of the goods of the late firm.

The defendants file answers, demur to the bill for want of equity, and move for a dissolution of the injunction, and to vacate the order appointing a receiver.

Upon argument of these motions, as well as the demurrer for want of equity, the original order appointing a receiver was modified, the receiver continued, the demurrer overruled, and the injunction continued.

From this order defendant appeals, and he prays here a reversal of this decree and the decrees and orders made by the Chancellor, upon the following grounds :

1. That the court·erred in granting an injunction without notice.

2. That the court erred in granting an injunction and appointing a receiver, on the allegations of the bill before answer.

3. That the court erred in overruling the demurrer.

4. That the court erred in refusing to dissolve the injunction.

The consideration of that portion of the decree overruling the demurrer of the defendants to the bill for want of equity, renders it necessary to pass upon the bill in this aspect of the case in the first instance, and any statement of the facts controlling our judgment as to the injunction and receiver is deferred until these matters are reached.

The equities claimed in argument are two :

First. An equity of the retiring partner upon the dissolution, and notwithstanding the agreement, to have a sale of what is alleged to be joint effects, and an application to the joint debts.

Second. That Chasten, the retiring partner, by his contract with West, the remaining partner, stands in the relation of his surety, he having agreed to become principal debtor, Chasten having an equity arising from this relation, and under his covenant to save harmless, that entitles him, the debts having become due, and he having been sued, to a decree of payment, and a decree for the specific performance of the covenant under the facts in the bill.

The partnership was dissolved on the 18th day of February,

A. D. 1868. So long as the effects are impressed with the character of partnership property, so long as they remain joint effects, dissolution cannot destroy the right which each partner has upon a dissolution to a general accounting, the payment of the partnership debts, and a division of the surplus according to their respective interests. Their connection remains until the business is wound up. "Between partners there are clear equities amounting to something like lien. They have equities to discharge each of them from liability, and then to divide the surplus." These equities and these rights, however, are like other equities, subject to be divested by the act of the parties. What is once joint property does not necessarily remain so always, and the question in this class of cases is, is this joint property, or has there been a severance? If it is joint, these equities, or as it is sometimes called lien, operates; if it is separate, then they cease to exist, and the property can only be affected by the operation of such equities as can ordinarily affect separate estate, where no such relation as partnership exists.

The question here then is simply, Is this joint estate, or is it the separate property of the defendant? Where there is a *bona fide* transmutation of the property from one partner to another, that is the end of the matter. At the dissolution the partner may call upon the effects by virtue of his equity to pay the partnership debts, but if he assigns or relinquishes his interest to the other to deal as he thinks fit with the property, to go into the mercantile world as a sole trader, the effects cease to be covered by the mantle of partnership property, and when this is removed so likewise vanishes these equities. If he has failed to resort to his equity when it was available, he is to blame himself.

Inquiry, then, is necessary to ascertain here whether by the bargain of dissolution that which was the property of all has become the property of one. There is no doubt here, for the bargain was, that "Thomas H. West, in consideration of the sum of two hundred dollars, and the *release* and *assignment* to him of all of Chasten's interest in the dry goods, groceries, &c., belong-

ing to the firm of West, Brother & Co., agreed to assume the payment of all Chasten's part of the debts (which was the whole of them), claims, and demands against the firm of West, Brother & Co., whether foreign or domestic, or whether existing in law or equity," and covenanted to hold him (Chasten) harmless, Chasten assigning and relinquishing all his interest to "Thomas H. West, his heirs, and assigns."

Thomas H. West has been for eight or nine months selling these goods on his own account. Should there be a surplus after paying joint debts, he is clearly not liable to his former copartner for any portion of it.

The legal effect of this instrument is to make what was before the joint property of all the separate property of one.

The case of Williams vs. Bush, 1 Hill, 624, cited at bar, went off on an altogether different ground. The property there sold was the "*individual property of Bush,*" and I apprehend that appellee does not rely upon that as being a case to the point that this is joint estate, or when he invokes principles applicable to joint property. The question in that case was as to the application of a particular fund resulting from a sale of the *separate* property of one of the copartners. Spicer, the retiring partner, contending that from equities growing out of peculiar relations between himself and his former copartner, and the joint creditors *who had notice,* he was entitled to an application of the proceeds of sales of the separate property of the copartner to the satisfaction of the joint debt. When we come to examine the second point we will give this case a further examination, as in another aspect the principle upon which it went off has an important bearing in this case.

The case of Devau vs. Fowler, 2 Paige, 400, it is claimed is a case precisely similar to this. In that case it was agreed that Fowler should take all the stock and effects and pay off all the debts due by the firm, and indemnify Devau against the same. Fowler became insolvent, and was threatening to dispose of all the partnership property and appropriate the proceeds to his

own use. It was held that the equity which existed in favor of each, on the dissolution, to have the partnership property applied to the payment of the debts, was not destroyed; the fair presumption being, in the absence of any express agreement to the contrary, that it was not the intention of Devau that the effects should be appropriated to the private use of Fowler, leaving the debts of the firm unpaid. It is beyond doubt true, both in England and the United States, that there is no such equity as to separate effects, and that this equity is operative only so long as it is joint property. The whole question is to some extent one of evidence, and there is but one way to reconcile this case with the other cases, and that is by the difference in the precise character of the agreement upon the dissolution. Compare, for illustration, this case with the case of Ex parte Williams, 11 Vesey, 3. In the last case the notice of dissolution simply stated a dissolution, and that all debts due from the partnership would be paid by the remaining partner. In a short time a commission of bankruptcy issued against the remaining partner, and the question arose as to whether there were any joint effects. Upon the bankrupt making affidavit that upon the dissolution the "agreement was that the retiring partner should give up and deliver to him the whole of the stock and effects; that he should have and take the same to his own use and account, and should pay all the joint debts, and that he never considered himself accountable for any surplus," Lord Eldon said: "There is distinct evidence of agreement that the joint effects shall be considered separate effects, and that fact calls upon me to declare the conclusion of the law that these are separate effects." In Devau vs. Fowler, the Chancellor held that a simple dissolution, with an agreement "to take all the stock and effects and pay off all the debts due by the firm, and indemnify complainant against the same," was not sufficient, and that there must be an express agreement that the effects assigned should be appropriated to private use. Here, then, the difference between these cases is in the character of the agree-

ment upon the dissolution, and without saying whether the agreement was construed properly in Devau vs. Fowler, the question arises, is there not a great difference between the character of the agreement in this case and the case now under consideration? The agreement here was not that West should take the stock and pay the debts simply, but there was a release, assignment, and relinquishment of all his interest in the dry goods and groceries, choses in action, and other property whatsoever, belonging to the firm, to Thomas H. West, his heirs and assigns. It struck me that the operation of the agreement in Devau vs. Fowler was perhaps misconceived, and Chancellor Walworth, in 1846, says of this case, "I am not quite certain that this court gave the proper construction to the agreement of the parties in Devau vs. Fowler, in supposing that the intention was that the copartnership debts should be first paid out of the proceeds of the property, before the purchaser should be permitted to apply any part of that property to other purposes." 1 Barb., Ch'y Rep., 484. But whatever may be said of this case, the agreement between West and Chasten admits of but one construction, and that is the one we have given it.

It may not have been intended that West should appropriate these goods to his own use, but the bargain clothes him with this power. There is, therefore, no general equity arising from the character of the effects now in the hands of West, and this leads us to inquire, is there an equity from the changed relations of the parties? Upon the execution of this instrument, the relation of partners between West and Chasten was destroyed, and all equities arising strictly from that relation passed away with the assignment of the goods; but the necessary consequence of the destruction of this relation is the creation of another in this case. The debts of the late firm are still unpaid. Both of the Wests, as well as Chasten, remain liable as joint and several debtors to the creditors of the late firm. Although the agreement is that one of them shall retain the partnership effects and pay the debts, they continue nevertheless bound as princi-

pals, and nothing which falls short of an agreement, express or implied, upon the part of the creditors to take the remaining partner as the debtor and discharge the other partners, can place them in the situation of principal and surety, so as to discharge the retiring partner by indulgence granted to the paying partner by the creditor.   4 Wash. C. C. Rep'ts, 271.

While this is true as to the relations to the creditors, is it not also true that upon West's receiving all the joint effects divested of the lien, agreeing with the retiring partners, in consideration thereof, to assume the payment of the debts, that a relation analogous to that of principal and surety from that moment existed between the parties? West assuming all the debts as between Chasten and himself, he becomes the primary and principal debtor, and in addition to this he covenants to hold Chasten harmless from them.

A question here arises, whether, both being principal debtors originally to a third party, they can by contract between themselves subsequently become, as between themselves, principal and surety without the consent of the creditor.   Marsh vs. Pike, McLean & Towle, 1 Sandford's Chancery Rep'ts, 204.   Pike lent Marsh $3000 on a house upon bond and mortgage.   Marsh sold the premises, subject to the mortgage, for $6000 to McLean, he assuming the payment of the debt.   McLean conveyed the premises to Towle subject to the mortgage, and Towle assumed the debt.   The debt became due.   Marsh applies to McLean and Towle to pay it.   Here is no modification of the original debt of Marsh to Pike.   He is still a principal debtor, but McLean and Towle have assumed the debt, first by contract between McLean and Marsh, and afterwards by contract between McLean and Towle.   Towle and McLean were in no manner connected with the creditor Pike, nor is there any understanding between Marsh and Towle.   Upon these facts the Chancellor says: "There is no doubt but that as between Marsh and the other two, McLean and Towle, he is to be regarded as their surety.   Not only were the mortgaged premises

made the primary fund for the payment of the debt, but the payment of the debt was assumed as a personal obligation. Towle is the principal debtor in reference to McLean, and both stand in the relation of principal to Marsh. It is well settled that a surety, after the debt has become due, may come into this court and compel the principal to pay the debt. Towle comes within the doctrine upon which this court requires the principal debtor to discharge the obligation for the indemnity of the surety. He is the party to pay the deficiency if the premises are insufficient."

Here was a simple assumption of the debt of Marsh by these two parties, who were unknown to Pike; and without a covenant to save harmless, the surety was given relief before payment of the debt, and the only fact except the relation of principal and surety alleged which would give him standing in a Court of Equity, was that Marsh, after the debt became due, applied to McLean and Towle to pay off the bond and mortgage.

Waddington et al. vs. Vredenberg, 2 Johnson's Cases, 230. White and Stout were partners. After dissolution, "White assumed all the business profits and responsibilities, agreeing to pay Stout fifteen hundred dollars for his store, and indemnify him against all debts due by the partnership." Say the court: "After the dissolution of the partnership between White and Stout, and White's undertaking to pay the whole of the partnership debts, Stout in relation to him is to be considered as a surety merely."

Williams vs. Bush, 1 Hill, 624. Bush and Spicer were partners. Being indebted on joint account to Williams & Macy, they gave their joint bond to pay all sums of money loaned to them, on which judgment was entered six months before dissolution. Bush & Spicer agreed to dissolve partnership, Bush paying Spicer $1000 and agreeing to pay all partnership debts and indemnify Spicer. Williams & Macy had notice of the dissolution and terms. The partners were indebted at dissolution to Williams & Macy, $2100. After dissolution of the firm of

Bush & Spicer, Williams & Macy *continued* loans to Bush upon the agreement that the judgment should stand as a security for them. Williams & Macy then dissolved, and after this Macy, who continues the business, makes advances to Bush upon the security of the judgment. One year and nine months after dissolution of the firm of Bush & Spicer, Macy levies an execution upon the *individual property of Bush,* who had become insolvent, realizes a sum of money under it, and the question arises how it shall be applied; whether to the joint debt of the old firm of Bush & Spicer, and thus relieve Spicer, or to the indebtedness of Bush to Williams & Macy, or to the indebtedness of Bush to Macy individually. Say the court: "As Bush had agreed to discharge all the liabilities of the firm, he was to be regarded as the principal debtor, and Spicer stood in the character of surety, and was entitled to all the equitable liens on the property of his principal;" and as the creditors had notice of these terms of dissolution, an equity arose which, together with the other facts, induced the court to direct an application of proceeds of the sales of Bush's individual property to the joint debt, to the relief of Spicer. Here the primary equity was the relation of principal and surety assumed by these parties with notice to the creditor. Whether the creditor should have been prejudiced as he was here by the entire relief of Spicer, in view of the insolvency of Bush, is a different question, but so far as any equities are administered between the parties arising from their contract, there is no doubt of its correctness.

These cases determine the relation of West and Chasten under their agreement. They are both cases in which the retiring partner assumed the debts of the firm, and we have in this case the relation of principal and surety, to which is superadded a covenant to save harmless, and without prejudice to the rights of the joint creditors, we must administer whatever equities, if any, result from this relation, and the covenant. The conclusion to which we come here is sanctioned by the familiar rule

in bankruptcy, where the jurisdiction is both legal and equitable in its character. Partners being joint debtors, and upon the payment of the whole of the debts by one, entitled to *contribution*, a solvent partner "may with strict propriety be called as to the share belonging to his partner, a person liable for the debt of another, and in that character, is allowed to prove; and in 4 Madd., 477, it is said: "It is now settled, that a solvent partner winding up the partnership affairs, is to be considered as a surety paying the debt. Each partner is a principal debtor for his own share, and they are mutually sureties for the share of each other. 6 Bing., 306; 4 Mad., 477; 2 M. & S., 195; Collyer on Part., 555.

This doctrine of the bankrupt court is only referred to, to show that this court, acting upon principles of equity, permits a solvent partner to occupy, for some purposes, the relation of surety to his bankrupt copartner, although each is liable for the whole to the joint creditor.

These views as to the relation between these parties may be thought, to some extent, to come in conflict with the reasoning of this court in the case of Griffin vs. Orman & Young, 9 Fla., 57. In that case, Sewall was a dormant partner, being one of a firm composed of Orman, Young and Sewall. After dissolution the goods were sold to Sewall, who agreed to pay the debts, giving a bond, with security, to pay the debts. Judgment having been obtained by the joint creditors against Orman & Young alone, the decree of the court below substituted Orman & Young for the creditors, giving them a standing in equity against Sewall, by virtue of the judgment, who was no party to it. The court, upon appeal, reviewing the case in this light, say that it was an anomaly to give Orman & Young a standing against Sewall by virtue of judgments against them, to which he was no party; and this view of the court, looking at that case as they did, was undoubtedly correct.

As all of the creditors were not, in that case, parties to the arrangement, upon the dissolution, and knew nothing of it, it

may be admitted, for the sake of argument, that Orman & Young could not have been entitled to the lien of the judgment as against Sewall, even though Sewall had been one of the defendants in execution, and it would not affect the relation of West & Chasten here, or any equity which Chasten claims; for he seeks to be substituted to no judgment liens of the creditors, but to work out his own equities against one who, as to himself, stands in the relation of a principal debtor. The court, in this case, speaking of this substitution or subrogation of Orman & Young, say: "In what way did Orman & Young stand as *surety with the creditors?* Whose creditors were they? Were they not the creditors of Orman & Young? Did they advance money to pay the debt of Sewall? No; they advanced money to pay their own debt, as well as Sewall's. It is true, that Sewall had agreed with them, Orman & Young, to pay these debts, and given his bond, with security, to that effect, but no arrangement had been made with the creditors."

If this language is to be restricted to the matter of subrogation, then under consideration, it may be well enough; but if the answers to these questions are to test whether the relation of principal and surety exists generally, it cannot be sanctioned.

A late case in 17 New Jersey Eq. Repts., 140. A. & B. are joint obligors in a bond to C.; both, upon the face of the bond, are principals; while in fact, A. had joined in the bond at the solicitation of B., his co-obligor, by whom the money was used, and A. was given relief as surety.

Had A. advanced money to pay this debt, would he not have been advancing to pay his own debt as well as B.'s, and is not every surety a debtor to the person who is the creditor of his principal? Because he pays his own debt is it any reason why he cannot be satisfying that which is primarily a debt of another person, who is principal debtor with reference to himself? Is not the creditor of every principal the same creditor of the surety? As to the necessity of assent by the creditor to create the relation between the parties in the case before cited,

decided by Chancellor Walworth, Pike, the original creditor of Marsh, knew nothing of McLean or Towle. McLean had "assumed" the debt of Marsh to Pike in his dealings with Marsh, and Towle had assumed the debt of Marsh to Pike in his dealings with McLean; and yet equity made Towle a principal debtor, and Marsh his surety.

To say that one of two persons owing the same debt cannot, by contract between themselves, stand in the relation, one as principal debtor and the other as surety, is doing nothing less than to deny the power to contract. A party can become the surety of two others, one of whom is principal in a bond and the other his surety, by contract with the creditor alone. In the case of Craythorne vs. Swinburne, 14 Ves., 165, Lord Eldon said: "If the real nature of the transaction is to be understood thus, that Henry Swinburne and Craythorne entered into a bond for 1200l. to the Mercantile Bank, Swinburne as principal, and Craythorne as surety, and Sir John Swinburne, who had no communication, as it appears, with them, proposed to the bank that he should become a co-surety, there is an end of the question ; but if not constituting himself co-surety with Craythorne, he proposed to the bank only that he would engage to pay them if they could not get payment from either of the others, then he becomes surety for the principal and the surety in the bond, and not co-surety with the surety." It is thus seen that Lord Eldon makes a party who contracted as surety with the principal in the bond, a principal debtor with reference to another person, who became his surety without even his knowledge.

In Marsh vs. Pike et al., Chancellor Walworth makes A., who in contracting with B. assumed a debt of C., which B. himself, in his contract with C. had assumed, stand in the relation of a principal debtor to C., and gives C. the standing of his surety in a court of equity. Here we have a court of equity making a principal a surety to one in reference to whom, or with whom, he had made no contract, and a surety a principal to one in reference to whom he had made no contract. In the one case the

creditor did not accept the principal debtor as his debtor at all, and in the other the surety did not stipulate with the creditor that he was to be received as principal debtor. Courts of equity, in such matters, are not limited to the precise and express nature of the contract.

Contribution among sureties does not stand upon any notion of mutual contract, but arises from the principles of equity and of natural justice, independent of the contract ( 1 Story Eq., 493) between themselves, much less the contract with the creditor. So in cases of insolvency of one of several sureties, that the share of the insolvent must be apportioned among the solvent sureties is not the result of contract, but is founded in doctrines of equity; and Lord Eldon says of this subject, when accounting for the jurisdiction at law, that "the *principle of equity* upon which . a surety has a right to call upon his co-surety for contribution being established, raises the *implied promise* upon which the jurisdiction of courts of law on this subject is sustained." 14 Ves., 164. It is thus seen that, independent of anything arising from the express contract, courts of equity often give relief.

Much, if not all, of this jurisdiction in reference to parties standing in such relations as principal and surety and co-surety in courts of equity, arises less from contract than from principles of natural justice; and in this case we but follow in that pathway in imposing upon West the obligation of principal debtor, which he in fact assumed by express contract, and extending to Chasten that relief which attaches to the relation which he bears to his former copartner.

In Brewer vs. Worthington et al., 10 Allen, Mass., 329, the plaintiff had retired from the firm of Worthington, Flanders & Gould, of which he and the defendants had been members, conveying to them all his interest in the property of the partnership, and providing that they should assume and pay all the debts and liabilities, and save the plaintiff harmless therefrom. Justice Dewey, in commenting upon this contract, which is the

same as that between West and Chasten, says: "This contract is something more than a mere contract of indemnity. It is also an agreement to assume and pay all the debts and liabilities of the late firm." This was a case at law, and it is to be regretted that the court did not say precisely what the contract was. If it was for more than indemnity, it was nothing less than that they would become principal debtors.

The effect of this agreement being, in equity, to place the complainant in the situation of a surety, and to make the defendant a principal debtor as to him, there are two classes of cases which are applicable: First. Those where there is the naked relation of principal and surety; and, Second. Those where the special covenant is superadded.

The case of Marsh vs. Pike et al., 1 Sanford, Ch'y Repts., 210, already alluded to, was a case of simple suretyship; and it was there held that a surety, after the debt has become due, may come into a court of equity and compel the principal debtor to pay the debt. From the decree of the Vice-Chancellor an appeal was taken, and the decree was affirmed by the Chancellor, in 10 Paige, 595. See also 4 Call., 202; 4 Mon., 492.

In Nesbit vs. Smith, 2 Brown, Ch'y Cases, 581, the language used gave a surety a *general right* resulting from that relation alone. It was: "It is clear, and has never been disputed, that a surety, generally speaking, may come into this court and apply for the purpose of compelling the principal debtor for whom he is surety, to pay in the money and deliver him from the obligation;" but twenty-three years afterwards, in 1808, this case was reviewed in the case of Dale and Perry vs. Lolley, and the court say "a bill will not lie upon any *general equity* by a surety against the principal, to have an indemnity, or to have the money paid into court, where no further time has been given, where the day of payment has not elapsed, and the surety has not been damnified, or is not in evident danger of being so, or unless a distinct agreement can be proved that it should be done whenever the plaintiff called on him for it."

33

It seems that when the day of payment arrives, without payment by principal, the equity arises. Lord Cowper, in Hungerford vs. Hungerford, Gill. Equity Reports, 67, says, when speaking of this matter: "If a person is security on a contract, there is a joint contract that the principal shall indemnify the security, *and the ground of equity is, that when the money is due the equity arises.*" In England, when the liability of the surety has attached in consequence of the default of the principal, the *surety, although he has not been sued by the creditor,* may apply to a court of equity and compel the principal to relieve him from his liability. Nisbet vs. Smith, 2 Bro. Ch'y Cases, 795; Gill. Eq. Repts., 67; Lee vs. Brook, Mos., 318; Antrobus vs. Davidson, 3 Mer., 569; 2 P. W'ms, 659; 20 Vin. Abr., 103, pl. 7; Burge on Suretyship, 378.

Sir Joseph Jekyll, in Lee vs. Rook, Moseley, 308, remarked: "If I borrow money, on a mortgage of my estate, for another, I may come into equity, as every surety may against his principal, to have my estate disencumbered by him, and the covenant in the mortgage deed to pay the money will bind the principal; for the money being borrowed for him, it is his debt, and the surety is only a nominal person." Lord Keeper North, in Ranelagh vs. Hays, 2 Ch'y Cases, 146, remarked: "It being unreasonable that a surety should always have such a cloud hanging over him, even though not molested for the debt, yet after the money is payable, the court will decree the principal to discharge it." The Master of the Rolls (in Antrobus vs. Davidson, 3 Mer., 578) alludes to these remarks in these two cases, as *dicta,* but he himself, in this case, says: "It is true, that a surety may come here to compel the principal to relieve him of his liability by paying off the debt."

It is said in 4 Dess., 47: "It would be very hard on securities if they were bound to wait until the creditor had actually obtained judgment against them, or compelled them to pay the money, before they could have recourse to their principal. He might waste his effects before their eyes, and have nothing left

to reimburse them after they have been forced to pay the debt, perhaps at enormous loss, by forced sale of their property. The moment, therefore, a suit was brought, I consider them endangered and damaged." See also to this point, 4 Dess., 45, 227; Rice's Eq. Reps., 287; 17 New Jersey Eq. Repts., 195; 4 Johnson's Ch'y, 131; 6 Johns. Ch'y, 407; 2 Stor. Eq., 730; 9 Grattan, 404.

In the last case cited, it was held that the creditors, who were to receive the money when recovered, are necessary parties, but that question is not raised here.

When the debt becomes due the equity attaches and arises.

Another class of cases upon a covenant to save harmless, authorize a bill to be filed to relieve the covenantee under the circumstances existing in this case. 2d Story's Eq., § 730, and case there cited.

The demurrer for want of equity was in this case properly overruled. We now come to consider the matter of the receiver and injunction.

It appears from the record in this case, that upon filing the bill an injunction was granted, and receiver appointed without notice and before answer, and this want of notice is one of the grounds upon which the decree in this case is sought to be reversed. The first interlocutory order made in this case cannot be sustained. The receiver appointed was directed to "take charge of, manage and sell the goods of the late firm, and apply the proceeds of said sale to the payment of the debts of West, Brother & Co." This goes much too far. Instead of simply restraining any improper disposition, or placing the goods in the custody of the court, it directs an application of the proceeds which should not be done until final decree settling the rights of the parties. It is to be remarked, however, that upon the coming in of the answers, the chancellor, upon a hearing of the motion to dissolve the injunction and vacate the order appointing a receiver, did virtually vacate the first order appointing a receiver, and make a new order appointing a different

receiver with modified powers. So far, then, as to the appointing the receiver without notice, the record discloses that the receiver now in charge, and the order defining his duties, was made after notice and argument. As to the want of notice of application for an injunction, there are many causes in which the giving notice would destroy its effective power and efficiency, and it would be the means often of augmenting the very wrong which it is invoked to prevent; besides, this court has heretofore laid down a general rule upon this subject, to the effect that a bill should not be dismissed or an injunction dissolved for deficient injunction bond, for non-payment of costs, or for want of notice. These matters can be remedied without going to that extent. 3 Fla., 351.

Upon the facts charged in the bill and admitted in the answer, we have seen there are such equities as create something more than a probability that the plaintiff will be *ultimately* entitled to a decree, and under such circumstances the granting an injunction, and the appointment of a receiver, are both matters within the discretion of the chancellor. Owens vs. Herman, 3 Mac. & Gov., 378; 2 Dan. Ch. Pr., (note,) 1409.

A receiver, however, against an acknowledged legal title, where the relief sought is a decree of payment, and the performance of an agreement to save harmless, and where there is no lien or acknowledged trust, should not be permitted except in a plain case.

If, however, in a case of this character arising out of confidential relations, the party acts iniquitously and unjustly, or fraudulently, pays no attention to his covenants, disregards the claims of his surety, and is pursuing such a course as threatens to result in his great damage and injury, the court may interfere. It will not do to wait until the threatened damage and injury occurs to such an extent as to ruin the surety. Then a court of equity will be powerless for good; and unless the creditor should intervene and attach before everything is made way with, or sold and deposited in other States, the party

will be ruined. In a case such as this the creditor can stand by and see this done, and his debt against Chasten is not affected; and the fact that it is a matter entirely within his discretion to look alone to Chasten should incline a court of equity to extend its aid if it is necessary.

If West is pursuing such a course as will render the relief which equity will give totally inoperative when the decree is passed, then it is the duty of the court to take such action as is necessary for the effective protection of parties standing in these confidential relations, and if necessary, to take under its control such an amount of the goods of the late firm which were lately joint effects as will enable it to discharge the joint debts, relieve the surety, and make the covenantor carry into effect his covenants. This is what he has agreed to do, and a Court of Equity having jurisdiction to decree payment and performance, it would be a reflection to say that it had power to command him to do this, and yet, when his acts justified it, no power to restrain him from such acts as would place it beyond the power of the court to protect complainant or prevent his ruin.

And this leads us to look into the facts. The partnership was dissolved some eight or nine months before the bill was filed; the joint debts as disclosed amounting to about four thousand dollars, the partnership having been in operation about two and one-half months, a large stock being transferred to him at the dissolution.

The sales by Thomas H. West have been principally for cash, the charge in the bill on this subject being that "the sales were principally for cash," and the answer, when specially interrogated upon the subject, being that they have not been "altogether for cash."

The bill states the amount of debts paid at a small amount over eight hundred dollars; the answer does not deny this. The bill charges repeated promises to pay at a given time, and a failure; the answer does not deny it.

The affidavits introduced upon the part of the complainant

state that the sales of West, in cash, averaged from nine and one-half to ten dollars per day, and that his expenses were small. The complainant has been forced already to pay a small amount of the debts. The affidavits set up that the goods were purchased on the credit of Chasten, the creditors relying upon his credit and character.

In May, 1868, the defendant states to one of the parties making affidavits that he had invested shortly before that time two thousand dollars in Missouri, and while not giving the precise amount, he states to another party that he has sent his ready money to Missouri.

Theophilus West, one of the defendants, although indebted in New York two thousand dollars, seems to have disposed of his goods, belonging to an old firm of West & DuBose, leaving his debts unpaid, and he is still liable for them twelve months afterwards, and becomes incensed when a creditor is informed that he can pay twenty-five per cent. of the debts, by a person who he himself had informed he could pay fifty per cent.

In the fall of 1868, Thomas H. West agrees with the attorneys of some of the creditors to pay in assorted stock at New York cost and charges, but when about to consummate the arrangement, insists that the goods are to be taken from either side of the store, taking first all on one side and then commencing on the other. The positive allegations of the answer are in many respects denied by these affidavits, and the circumstances surrounding the whole matter incline us to give credit to the affidavits. Thomas H. West obstinately and positively refuses to give any account of the debts, and when interrogated as to them in the bill, avoids answering. When applied to in behalf of Chasten and the creditors even as to assuming the debts, his reply consists of allusions to his "stubbornness and shrewdness," and a remark that if anything could be made out of him at law complainant was welcome; thus in effect positively denying any relief but that which the courts will grant. Some of the creditors offer to take the face of their claims without interest; he

declines. He also declines individually to assume and secure the debts. When told that he has money to pay the debts, and he had better pay them, he answers, "I know that, but I can do better with the parties in New York;" the witness stating his impression to be that he said he would get them up at fifty cents on the dollar. Subsequent to this he is applied to again, and he then says he has sent all the ready money he·had off to the West with his brother, and that he was establishing business there. In the meantime his surety, holding his covenant, is being sued and harassed with threats of proceedings in bankruptcy, and the defendant absolutely refuses to let him know what debts he has paid and what are still due. In replenishing his stock from foreign markets, it appears that some of the goods are shipped in the names of other parties.

These seem to be the facts from the bill, answer, and affidavits, used upon the hearing of the motion to vacate the order appointing a receiver, and in addition to them the defendant sets out in his answer a schedule showing that he is worth the sum of ten thousand dollars, which, instead of being any excuse, is the best evidence that his failure to avert the threatening and impending ruin of his surety, or to comply with his covenants, results from acts of his own entirely inexcusable, and, not to use a harsher expression, in the utmost bad faith. The statute of this State as construed by this court in Ex parte Edwards, 11 Fla., 188, if that statute is applicable to the present system, and the construction given correct, makes it necessary for courts of chancery to exercise their discretion in appointing receivers, with reference to the fact that an injunction is but of little value when applicable to personal·property, and therefore to exercise it more liberally. Indeed, the practical abrogation of this writ for any good purpose, impairs the symmetry and perfection of a system which it would be more than difficult to improve, and makes it necessary for a court of chancery to resort to harsher means than it otherwise would.

In view of the fact that the receiver is authorized to take

possession of only those goods which came from the hands of those to whose benefit they are now sought to be applied, and to those purchased with the proceeds of those goods, and the allegation of the bill *that West promised to so apply the proceeds*, and of the fact that although this is denied by the answer, yet West states that such was his intention at that time, as well as in view of the now manifest intention of Thomas H. West, as shown by his acts, and as the equity of the bill is clear, the decree of the court below must be affirmed; but we think as the legal title to these goods is in the defendant, and there is no specific lien and no express trust, it is but proper that the property should be restored to his possession upon his giving such security as may be satisfactory to the chancellor for his compliance with whatever may be the final decree of the court below to the extent of the value of these goods, and in case of appeal to this court, for his compliance with its decree, or the decree of the court below made in conformity to its order to the extent of the value of these·goods.

It is therefore ordered, adjudged, and decreed that the decree of the chancellor is affirmed, and the chancellor is directed, in the event of the security mentioned above being offered, to vacate the decree as to receiver and injunction upon the terms stated.